STAFFORD, Respondent, vs. CHIPPEWA VALLEY ELECTRIC
RAILROAD COMPANY, Appellant.

*April 11 — April 30, 1901.*

*Street railway: Collision at street crossing: Negligence: Court and jury:
Contributory negligence: Duty to look and listen: Motorman: De-
gree of care: Special verdict: Municipal corporations: Ordinances:
Franchise: Validity: Sounding of gong on street car: Violation of
ordinance, when negligence per se: Instructions to jury: Appeal:
Judgment on reversal.*

1. It being undisputed that a collision between a street car and a
   wagon, suddenly drawn upon the track in front of such car, at
   a street crossing, did not result in any injury to the car other
   than a few scratches of the paint on the front end; that it did not
   cause any disturbance of the lights upon the car, the persons in
   charge thereof, or the passengers thereon, other than that caused
   by sudden application of the brake and reversal of the current;
   that the car stopped substantially at the place of the collision; and
   that it did not materially push the wagon ahead upon the track
   nor mar nor break it at the point of contact, such physical situation
   is so inconsistent with the theory that the car was going several
   miles per hour, for the few seconds required for a traveler, ap-
   proaching the crossing at a speed of three miles per hour, to travel
   thirty feet, as to leave no ground for the jury to say that the mere
   speed of the car was so great as to constitute actionable negli-
   gence.

Stafford vs. Chippewa Valley Electric R. Co.

2. Testimony of a person or any number of persons that he or they, when approaching a street-car track with a view of crossing it, looked along the track for a coming car and did not see one, though a car, by reason of physical conditions and distances to be traveled, must have been in plain sight and so near the point of observation as to render an attempt to cross the track in front of it dangerous, is inconsistent with all reasonable probabilities, and the jury should not be required or allowed to consider the subject as involving a disputed question of fact.

3. It is the duty of a person, under the foregoing circumstances, in the exercise of ordinary care for his own safety, to see the danger that is perfectly obvious by reasonable attention to the situation, and not to go upon the track in front of the car that is so near that its speed will necessarily have to be greatly slackened or stopped, or collision with the wagon rendered probable; and failure in that regard is contributory negligence as a matter of law.

4. It is the duty of the traveler upon the street, in approaching a point where he desires to cross a street-car track, to look and listen for a coming car and to perform that duty when and where he will have reasonable opportunity to render his efforts in that regard effective, and it is as much his duty, as a matter of law, to see an approaching car which is in plain sight and in dangerous proximity to the crossing, and not to negligently place himself in the way of it, as it is to look for the car; hence evidence that he performed the duty of looking, but did not see the actually approaching car, does not raise a question of fact.

5. It is not actionable negligence for the motorman in charge of a street car, when the car is in operation upon a street and approaching a street crossing, to fail to exercise the highest degree of care, or such care as a vigilant or prudent person would exercise under the same or similar circumstances. It is sufficient if he exercises the care of a person of average prudence in the same or similar circumstances.

6. In an instruction to a jury the words " ordinarily prudent men," "the great mass of mankind " and " a person of average prudence " express synonymous terms, and when coupled with the words "ordinarily exercised under the same or similar circumstances " express the *quantum* of care required in order to meet the particular danger, or the danger of probability of injury therefrom if not effectually guarded against, as it increases or diminishes.

7. The mere acquirement by purchase of a street-railway franchise containing regulations as to the manner of operating cars, in compliance with a condition of a new and independent franchise

Stafford vs. Chippewa Valley Electric R. Co.

which does not refer to the old grant or in any way make its provisions a part of the new one, such condition being clearly imposed to prevent a conflict of rights, does not add to or restrict the provisions of such new grant.

8. A city ordinance is not valid unless reasonable, and whether it satisfies that requirement or not is a judicial question.

9. A city ordinance requiring the continuous ringing of a bell upon street cars while such cars are in motion upon a street is unreasonable and to that extent void for any purpose, unless made a condition of the grant of the franchise.

10. If such a requirement is valid for any purpose because made a condition of the grant itself, the violation thereof does not constitute actionable negligence or evidence of such negligence, because, as regards the safety of travelers on the street, it is unreasonable.

11. An instruction that a motorman in charge of a street car, when the car is in operation upon a street and approaching a street crossing, must exercise due care or proper care, unexplained, fails to instruct and may mislead. Coupled with instructions to the effect that the term refers to the highest degree of care, or any degree of care other than that of a person of average prudence under like or similar circumstances, it is error.

12. A traveler upon a street at a street crossing, desiring to cross the street-car track there situate, has not the same right to require the speed of a car to be slackened to enable him to pass over the track as the person in charge of the cars has to require him to give way to allow the car to pass.

13. The motorman in charge of a street car approaching a street crossing must use ordinary care for the safety of travelers liable to go into the pathway of the car, but he has the right to expect that such travelers will use ordinary care to inform themselves of the approach of the car and not retard its passage.

14. Where it appears from the evidence that a motion, duly made, to change an answer to a question in a special verdict and for judgment should have been granted, under the rule that the appellant is entitled to have done that which ought to have been done, judgment will be entered in the appellate court remanding the cause upon reversal with directions to the trial court to correct the verdict as indicated and render judgment for the defendant.

APPEAL from a judgment of the circuit court for Eau Claire county: JAMES O'NEILL, Circuit Judge. *Reversed.*

Action to recover compensation for personal injuries

caused under circumstances alleged in the complaint in effect as follows: About 9:30 o'clock p. m., August 27, 1899, while plaintiff and her husband, accompanied by several other persons, in a lumber wagon drawn by two horses, were traveling south on North Farwell street at the crossing thereof with Wisconsin street, a point much used for public travel, said Wisconsin street having a street-railway track in operation thereon by defendant under a franchise limiting the speed of its cars to ten miles per hour, and requiring a bell to be continuously rung on every car while in motion upon a street,— and while they were in the exercise of ordinary care in the act of passing over the street-car track, one of its cars approached such point from the east at a speed of twenty-five miles per hour without any bell being sounded and without the motorman paying any attention to their presence, although their situation of peril was in plain view of such motorman, whereby such car collided with their wagon and overturned it, causing severe bodily injuries to plaintiff, which were described in general language. It was further alleged in effect that the track was laid on a down grade from the east, to the point where the collision occurred, for a distance of several hundred feet; that it was obscured from view from Farwell street, upon which plaintiff was traveling, by a high billboard on the north side of Wisconsin street; that at a point thirty-four feet north of the north rail of the track, a car located thereon at any point to the east could be seen for a distance of about 375 feet; that plaintiff and her associates looked that way for a car while at such point and not seeing any proceeded slowly, turning their attention to the west to see if a car was approaching from that direction; that they again looked east as the horses were on the north rail of the track, when they saw a car approaching, so close to them that it seemed that the only way to save themselves, if any existed, was to complete the crossing; that they endeavored to do so, but

before they got clear of the track the collision and injury occurred.

The answer admitted the collision and injury. It put in issue the allegations of negligence as regards defendant's motorman in handling the car, and pleaded contributory negligence of plaintiff as a defense.

The evidence established beyond controversy the following facts: The night was dark but still, and there was nothing to interfere with hearing or seeing an approaching car while it was a sufficient distance from the Farwell street crossing to enable a traveler upon such street to avoid being injured by it by the exercise of reasonable diligence to that end. Farwell street was a north and south street, and Wisconsin street an east and west thoroughfare, the two crossing each other at right angles at the place of the accident. The street-car track was on Wisconsin street. The north side of the street was about thirty feet from the north rail of the track. For several hundred feet of the approach of the street-car track to the crossing, from the east, it was on a down-grade towards the crossing. Wisconsin street was lighted by electric lights, but Farwell street, in the vicinity of the crossing, was not lighted. The street car that collided with the wagon in which plaintiff was riding was an open car. It was lighted with a number of electric lights and was furnished with a headlight which was burning brightly at the time of the accident. The approaching car could have been plainly seen, by anyone standing within the territory that was common to the two streets, while anywhere within a distance of 800 feet on Wisconsin street from the place of collision. It was seen by many witnesses, several of whom testified for plaintiff, including all who so testified on the subject. The car was but a short distance from the place of collision when the team was within a few feet of the north rail of the track. The evidence was conflicting as to the speed of the horses, but on plaintiff's side it showed that

they were going about three miles per hour. The evidence was also conflicting as to the speed of the car, witnesses placing it from four to twenty-five miles per hour. There was a conflict as to the extent the car bell was sounded and as to what efforts were made to slacken the speed of the car or to stop it immediately before the collision. It was established beyond controversy that the car collided with the wagon back of the front wheels and immediately in front of or with the hind wheels of the wagon, but that the latter were not broken in any way so as to indicate that they came in contact with the car. The owner of the wagon said they were racked a little. The wheels were not splintered or marked, neither was any part of the wagon broken by the collision itself, unless it was the wagon reach. The car was not broken or injured in any way other than a few scratches on the front end. The lights in the car did not go out, nor were they disturbed. The jar of the car was not sufficient to inconvenience the two passengers on the car or attract their attention particularly to the fact that anything unusual had happened. The motorman was not moved from his place at all, neither was the conductor, except slightly, as the brake was put upon the car and the current reversed to stop it. The motorman brought his car to a dead stop almost at the instant of the collision, the location of the car after the stop being about at the manhole in the center of the street. The space occupied by the team and wagon was about twenty-one feet long. When the occupants of the wagon were so located that they had full opportunity to see a car, if one was coming, at any point within 800 feet from the crossing, the horses' heads were about fifteen feet from the north rail of the track; from that time till they were frightened by the approach of the car they traveled about twenty feet, and up to the instant of the collision they traveled about thirty feet. At most, according to the finding of the jury, the car was going not to exceed ten miles per

hour or about three and one-half times as fast as the horses were traveling when the motorman first applied his brake, which was some distance from the point of collision. Plaintiff and some of those who were associated with her in the wagon, at the time of the accident, testified, all agreeing substantially that they looked for a car when they could easily have seen one if it was within a distance of 350 feet from the crossing and when the horses' heads were within about fifteen feet from the north rail of the track, and that the car struck the wagon in the vicinity of the hind wheels. They stated that they looked east and saw no car; that they then looked west and hearing a car approaching, but not seeing it, and supposing it was coming from the west and was obscured by a turn in the track a block away, they continued to look in that direction for a brief space of time till the noise of the car so increased that they were moved to turn and look again to the east, when the car was almost upon them. There was evidence of some disturbance of the horses caused by the approach of the car, but it was practically undisputed that such disturbance did not occur till about the time the horses stepped upon the track and the occupants of the wagon observed their peril.

Stating some of the material evidence more in detail, without attempting to quote what was said by witnesses *verbatim*,— the city engineer stated that by taking an observation east on Wisconsin street at a distance of thirty-one feet and some inches north of the north rail of the track — the point at which it is claimed the occupants looked east — an approaching car could have been seen if located at any point for a distance of 349 feet from where the collision occurred, and that at a point a few inches nearer the track, one could have seen a car located anywhere on the track to the east for a distance of about 800 feet. One of the occupants of the wagon said that when she looked east she could see all the way up to a point which was over 800 feet from the

crossing.    Witness Haggarty, for plaintiff, said she saw the
team on Wisconsin street; that she saw them when the
wagon was coming onto the street; that in an instant or so
she saw the car coming at a point that was about 140 feet
from the crossing; that her attention was on the car for a
brief space of time; that then she heard a person in the
wagon "holler," whereupon she looked again at the team and
it was on the track, at which time the car was about forty
feet from the line of Farwell street; that the team was
walking till the front end of the wagon was on the north
rail when they commenced to prance from fear.    Witness
Becker, for plaintiff, said that he saw the occurrence and
saw the team and the car shortly before the collision; that
when he saw the team first they were just coming over the
sidewalk or crossing on the north side of Wisconsin street,
and that the car at that time was almost to Farwell street;
that the car struck the wagon mostly on the hind wheels;
that when he first saw the horses the car was nearly to the
line of Farwell street; that the car was a little way up the
hill; that the horses were afraid of the car for it was right
near them; that he could not tell just where the car was
when he first saw the horses.    Witness Rustin, for plaintiff,
said he saw the accident; that the car passed him at a point
that was about 140 feet from the place of the collision, be-
fore he saw the team; that when he saw the horses they
were near to or on the track and the car between him and
Farwell street, and nearer Farwell street; that the car passed
him going about twenty-five miles per hour and did not
slacken its speed perceptibly till the collision occurred; that
it went a little way after the collision.    Other witnesses for
plaintiff testified that the car was going at great speed be-
fore it struck the wagon, some putting it as high as twenty-
five miles per hour, and that the motorman made little or
no effective effort to slacken the speed of the car; that at
the time of the collision there were two reports (one evi-

dently being caused by the collision and the other by the wagon box when it struck the ground). One witness said that he heard a kind of bump followed by a crash. Some thought the first report, and others that the last report, was the louder.

The motorman for defendant testified that as his car approached the crossing and when it was some distance away and before the team came onto Wisconsin street, the brake was partly on; that the car was not going over four or five miles per hour; that when he observed the team making for the crossing he tightened his brake and reversed the current; that the occupants of the wagon were not paying any attention to their situation; that the driver did not pay any attention to the danger till a woman back of him raised up and "hollered," at which time the horses became disturbed; that they jumped right in front of the car; that he did all he could to stop it and had it almost to a full stop when it reached the wagon; that it missed the main wheels and passed in front of the hind wheels; that they struck the drawbar, which extended in front of the car; that the horses jumped, causing the left hind wheel of the wagon to lift up over the drawbar, at which instant the reach parted, causing the box to leave its place on the back hounds; that immediately thereafter the box was overturned and the horses ran away with the front wheels of the wagon; that the car stopped almost instantly after the collision and at the manhole in the center of the street; that the wagon was not broken by the car, nor the car injured in any way by the wagon; that there was no evidence of the accident on the car except a few scratches; that he was not disturbed in his place upon the car, and that the lights were not disturbed. He said he kept a sharp lookout all the time and had his car under complete control, and that he sounded the car gong repeatedly. The conductor on the car said that the team came from the north and right onto the track, and that

the motorman applied his brake and reversed his current as soon as he could, causing the car to stop in about half its length; that the car did not in fact strike the wagon; that it was about to a stop as the left hind wagon wheel struck the drawbar extending in front of the car. The passenger on the car corroborated the motorman and conductor. She said she felt a little shock but did not hear any crash till the car stopped; that she then heard the noise of the wagon; that the car did not move again till it started on the trip. She agreed with the motorman and conductor that the car gong was sounded and that vigorous efforts were made to stop the car. She also agreed with the motorman that the car stopped about at the manhole in the middle of the street. There was other evidence corroborating the testimony of the motorman.

There was evidence of the existence of a street-car franchise adopted in 1888, containing the limitation on the speed of cars and requirement as to the continuous ringing of a bell upon each car while in motion upon the street, alleged in the complaint; also evidence that the franchise granted by such ordinance, subject to such limitation and condition, was the property of defendant by purchase from, through, or under the original grantee. There was also evidence that a new and independent franchise was granted in 1897, under which the railway was being operated at the time of the accident, which ordinance recited that it was granted to take effect on condition that the original ordinance had passed by purchase to the new grantee. The evidence showed that such new ordinance did not contain any regulation as to the manner of running cars or giving signals of their presence on the street by the sounding of bells or otherwise.

A motion for a nonsuit was made at the close of plaintiff's evidence, which was denied and the ruling duly excepted to. At the close of the evidence a motion on behalf

of defendant, for the direction of a verdict, was denied and the ruling excepted to. The cause was submitted to the jury for a special verdict under instructions to which many exceptions were taken which will be referred to in the opinion so far as necessary. The jury rendered the following verdict:

" *Q.* 1. Did the defendant, in the manner in which it operated the cars which collided with the wagon in which plaintiff was riding, fail to exercise the highest degree of skill and care to avoid a collision, which a careful and vigilant man would observe under like circumstances in the management of such business ? *A.* Yes.

" *Q.* 2. If you answer the last question 'Yes,' then was such failure to exercise such skill and care, the proximate cause of plaintiff's injury ? *A.* Yes.

" *Q.* 3. At what rate of speed was the car which collided with the wagon in which plaintiff was riding, traveling between Dewey and Farwell streets, at the time the motorman first applied the brakes ? *A.* Ten miles per hour.

" *Q.* 4. Did the defendant run its car, at the time in question, between Dewey street and Farwell street, at a higher rate of speed than a prudent and vigilant person engaged in the management of such business, would have run it under the same circumstances ?' *A.* Yes.

" *Q.* 5. If you answer the last question 'Yes,' then was such rate of speed the proximate cause of plaintiff's injury? *A.* Yes.

" *Q.* 6. Was a bell rung continuously on the car which collided with said wagon while it was moving between Dewey and Farwell streets? *A.* No.

" *Q.* 7. Was the motorman of the defendant guilty of any want of ordinary care in the manner and extent he rang the bell? *A.* Yes.

" *Q.* 8. If you answer the last question 'Yes,' then was such want of ordinary care the proximate cause of the injury the plaintiff sustained? *A.* Yes.

" *Q.* 9. Was the plaintiff guilty of any want of ordinary care, at and prior to the collision, which contributed to the accident? *A.* No.

" *Q.* 10. If the plaintiff is entitled to recover, at what sum do you assess her damages? *A.* One thousand dollars."

On the coming in of such verdict defendant's counsel moved the court to strike out the answer to question 9 and insert in place thereof an affirmative answer, and for judgment on the verdict as so corrected, which motion was denied and the ruling duly excepted to. Other motions were made and exceptions to the rulings thereon preserved so as to present the questions involved on appeal. Judgment was rendered for plaintiff.

For the appellant there was a brief by *Frawley, Bundy & Wilcox,* and oral argument by *R. P. Wilcox.*

For the respondent there was a brief by *Thos. M. Casey* and *A. J. Sutherland,* and oral argument by *Mr. Sutherland.*

MARSHALL, J. The record discloses many reversible errors, most of which are violations of such plain and familiar principles of law, it is not considered that we would be justified in indulging in any very extensive discussion of them or citation of authorities. If the numerous decisions of this and other courts already in the books, on the points to which we refer, are not sufficient to prevent such obvious and plain departures from correct principles, as to some extent, at least, ruled this case in the trial court, perhaps it is useless to add to what has been said and is best to rely upon a mere correction of the errors and brief reference to elementary principles as the most effective way, in the particular jurisdiction involved, of preventing a recurrence of the mischief in the future. Trial courts must deal firmly and with courage in administering the great power intrusted to them. Established principles of law must prevail, regardless of the condition, and regardless of the station, of parties, natural or artificial. The most humble must have the full benefit of all the wise safeguards designed in the law for the preservation of personal and property rights, and the same benefits must be as fully vouchsafed to every other party. The famed patron of justice must be blind to mere

parties in actual as well as in theoretical administration,
weighing facts, and them only, by those principles of right
and justice, settled in the law, for separating right from
wrong, denying redress in the particular case in hand, even
though one party would be greatly benefited by an oppo-
site conclusion while his adversary would not be perceptibly
burdened thereby, wherever the violation of legal rights
does not appear, which is the essential to support legal re-
dress.  Any other course would strike at the very founda-
tion of the judicial system which is the embodiment of the
wisdom of ages.  If there is any class whose members have
greater interest than any other in the maintenance of legal
standards it is the most humble, the one whose members
are the most defenseless, having little or no protection apart
from the safeguards furnished by such standards, but who,
with such safeguards properly administered, can attack or
defy the most powerful in the vindication of their legal
rights.

The evidence in this case leaves no room for reasonable
doubt but that, as early as the first opportunity which plaint-
iff and her associates had for taking a fair observation to
the east, as they approached the street-car track, and when,
by their own evidence, they did take such observation —
giving plaintiff the benefit of every reasonable if not pos-
sible inference from the testimony in her favor — there was
a clear view of such track to the east for a distance of about
350 feet, and that the horses traveled thereafter, going at
the rate of some three miles per hour or approximately four
and one-half feet per second, about twenty feet, before they
became so frightened by the noise or sight of the approach-
ing car, which was only a very short distance away, and was
approaching, according to the verdict of the jury, at a dan-
gerous rate of speed or about eleven feet per second.  So
when full opportunity for observing the car existed, and
plaintiff and her associates testified that they looked east, it

Stafford vs. Chippewa Valley Electric R. Co.

was not more than forty feet further away than when the horses became so frightened as to draw the attention of the driver to the danger, was a conspicious object, and not more than 100 feet from where the collision occurred. The idea that the car moved from a point where it was out of sight from plaintiff's point of view when she looked, to where it was when the horses became frightened, a distance of some 275 feet, while the horses traveled but about twenty feet, making the speed of the car somewhere about fifty miles per hour or twice as great as the most extravagant testimony of plaintiff's witnesses puts it, is as well within the bounds of the ridiculous, we venture to say, as anything that has heretofore received serious consideration by a trial court or jury. We cannot believe for a moment that the learned trial court or the jury believed that such a thing could be within reasonable probabilities or that the case was submitted to the jury upon any such theory.

So the case comes down to this: The car was in plain sight of plaintiff and her associates when she looked east. It was not more than about 100 feet away. It was not only within sight but it was strikingly so and was within hearing. The night being dark, the car an open one, with many electric lights and a headlight that sent its rays across the intersection of the streets some distance in advance, and it being on an up-grade from the crossing, it was necessarily a very conspicuous object from the point of observation at which, according to plaintiff's evidence, she looked east along the track. Under those circumstances is it reasonable to say that such care as was testified to by plaintiff and her associates, or any reasonable care, was exercised to discover the presence of the approaching car, and that the discovery was not made ? To that there can be but one answer. Either the observation was not taken and the testimony to the contrary is false, or the car was seen and the testimony the other way was false, and the accident occurred by the driver

of the horses attempting to cross the track regardless of the danger, depending upon the vigilance of the motorman to stop his car before reaching the wagon. Any other answer would be contrary to all reasonable probabilities. This is one of those very plain, cases sometimes met with, where clear improbability was brought within the limits of reasonable probability, as regards the situation of the jury, by the submission to them of the question involved. Its submission was necessarily a suggestion by the court that there was evidence to sustain plaintiff's theory upon some reasonable ground. That, to some extent, justified the jury in so treating the question, and in saying that to be a fact which all reason and common sense must condemn. The wrong thus done received such affirmance after its commission that the responsibility was cast upon this court to right it. As has heretofore been said, no greater injury can be inflicted upon a plaintiff in a case of this kind than to stimulate his hopes by a result, and cause him to exhaust his resources in defending such result, which is contrary to reason and cannot stand the test of a review. It should be kept clearly in mind that courts and juries go beyond their legitimate sphere by deciding that a fact exists which is contrary to all reasonable probabilities, and that such is the case no matter how many witnesses testify to the existence of such facts. The testimony of plaintiff that she looked for a coming car when it must have been plainly in view, yet did not see it, cannot be true consistent with possession by her at the time of the capacity for seeing, as to which there is no question. The point under discussion is ruled by *Groesbeck v. C., M. & St. P. R. Co.* 93 Wis. 505; *Schneider v. C., M. & St. P. R. Co.* 99 Wis. 378; *Steinhofel v. C., M. & St. P R. Co.* 92 Wis. 123; *Cawley v. La Crosse City R. Co.* 101 Wis. 145; *Flaherty v. Harrison,* 98 Wis. 559; *Badger v. Janesville C. Mills,* 95 Wis. 599; *Hyer v. Janesville,* 101 Wis. 371; *White v. C. & N. W. R. Co.* 102 Wis. 489–493; *O'Brien v. C., St. P., M. & O. R. Co.*

102 Wis. 628–633; *Baxter v. C. & N. W. R. Co.* 104 Wis. 307–330; *Koester v. C. & N. W. R. Co.* 106 Wis. 460, and many other cases.

It follows that,— since it must be conceded that it was the duty of the plaintiff, in the exercise of ordinary care for her own safety, to see the danger that was perfectly obvious by reasonable attention to the situation, and not go upon the track in front of the car that was so near that its speed would necessarily have to be greatly slackened or it would have to stop or render collision with the wagon probable,— she was guilty of contributory negligence as a matter of law, and the trial court should have so decided on the motion for a nonsuit, and should have so held at each subsequent occasion when the question was presented for decision.

What has been said, together with a conclusion reached which will preclude a retrial of this case, renders it unnecessary to deal with other errors; but it is considered that regard for the administration of the law in future cases justifies, if it does not call for, treatment of such errors to some extent.

In the first question the jury were asked to find whether the motorman exercised the highest degree of skill and care to avoid a collision which a careful, vigilant man would observe under like circumstances. In the instructions given as to such question the jury were informed in the main as follows:

"The language of the question itself involves what is held to be a degree of care which ought to be exercised by an electric railroad company in the management of its cars. It is the duty of a motorman on an electric car to exercise the highest degree of care to avoid any collision or accident, especially at street crossings."

There was more of the same sort. If the proposition thus given to the jury as the law governing the standard of care with which a street car should be operated, as regards the safety of travelers upon the street, has any support

worth mentioning in the authorities, we confess want of knowledge of it. No such authority is suggested by respondent's counsel and we venture to say that none exists. It is not improbable that the standard of care suggested by the learned circuit judge is the one that ought to prevail, but courts thus far have certainly not ventured to establish it so as to make it a rule of action. If established ever, since the law is now so firmly established to the contrary, it must be done by the legislature, not by the courts. A motorman circumstanced as the one in question was, or in any other case as regards persons upon the street, is bound to use ordinary care and nothing more,— such care as ordinarily prudent men, or such the great mass of mankind, or such as a person of average prudence ordinarily exercises under the same or similar circumstances. We should say in passing that the multiplication of terms is only to cover the various ways in which the rule is generally stated. They are synonymous terms. The degree of care required in order to come up to the standard of ordinary care must be greater or less in one situation than in another according to whether the danger and the character of it, all things considered, are greater or less. As danger, or the degree of probability of injury therefrom, if it is not effectually guarded against, increases, necessarily the *quantum* of care should increase, but the standard by which it should be measured remains the same. It is the degree of care which a person of ordinary prudence ordinarily exercises under the same or similar circumstances. As is often stated (*Nass v. Schulz*, 105 Wis. 146), the rule in the abstract, as regards ordinary care, is such care as is ordinarily exercised by persons of average prudence. Such care relative to any particular state of facts requires the addition of the term " under the same or similar circumstances," because what may be considered ordinary care under one state of circumstances is by no means, necessarily, such care under different

circumstances.   Both elements of the rule are significant.
It is incorrectly stated as to any given case by the omission
of either of such elements.   No citation of authority, it
seems, is required to support this doctrine. . It is too familiar.
The standard of care which the trial court said the conduct
of the motorman should be tested by was entirely out of
place in the case.   The finding of fact on the subject was
immaterial.   It did not constitute a legitimate basis for any
judgment against defendant.   If defendant was guilty as
found, no legal liability would follow, since there was no
legal duty to exercise the high degree of care involved.

The next attempt in the verdict to submit to the jury an
inquiry covering wrongful conduct constituting actionable
negligence was in question 4, where they were required to
find whether the car, at the time in question, was run at a
higher rate of speed than a *prudent and vigilant* person en-
gaged in the management of such business would have run
it under the same circumstances.   That inquiry was imma-
terial.   No such standard of care was the proper test to be
applied.   All that has been said in respect to the first ques-
tion applies to the fourth.   The proper inquiry for submis-
sion to the jury, if any was necessary on the evidence,—
which at least, it seems, is doubtful, since there was no con-
troversy but that the car was stopped substantially at the
place of the accident, without any injurious consequences
to either the car or the wagon, indicating beyond contro-
versy that the former was not much more than merely in
motion at the time of the collision,— was whether the car
was being run faster than a person of ordinary care would
have run it under the same or similar circumstances.   We
may properly say in passing that the improbability, impos-
sibility would be the better term, of an electric car, going
several miles per hour on a down grade, colliding with a
wagon and the car stopping substantially at the point of
the collision without the persons on the car being materially

disturbed or the car showing any evidence of the occurrence other than a few scratches in the paint and without the wagon being thrown forward upon the track or broken or marred at the place of contact, did not seem to be appreciated in the submission of the case. Such circumstances so outweigh any amount of testimony, from the lips of witnesses, that the car was going many miles per hour at or about the instant of the collision, as to leave no room for such testimony to be true.

The third subject of supposed wrongful conduct was submitted to the jury by the sixth question, being the one as regards whether the bell on the car was rung continuously. That test of defendant's duty was supposed to be material by the regulation in the street-car franchise of 1888, which required a bell on each street car to be continuously rung when the car was in motion upon the street. There seem to be three reasons why the fact found by the jury in answer to the sixth question was immaterial:   (1) If the regulation in the old street-car franchise was in force as an ordinance regulating the operation of cars, in the sense of being a general police regulation enacted by the city government — and we are unable to see any reason for that view,— it was void because it was unreasonable.   (2) If such regulation was a condition of the grant of 1888 and as such binding upon the grantee, reasonable or unreasonable — since the grant was accepted with the condition — the binding effect thereof as regards the subject of negligence would still have to be tested by whether it was a reasonable regulation or not, as to promoting the safety of persons traveling upon the street.   (3) Defendant, at the time of the accident, was operating its cars under an entirely independent franchise in which there was no provision as regards the ringing of bells upon its cars.

It is obvious that there was no intent, by the ordinance of 1897, to ingraft upon it the provisions of the ordinance of 1888.

The corporation that once possessed the grant of 1888 had practically gone out of existence, though the ordinance itself was still in existence as a property right, and stood in the way of granting a conflicting franchise. So it was made a condition of the new grant that it should not take effect unless the grantee was in fact the owner of the old franchise as such grantee was reputed to be. The new grant was broadly made, subject only to " the general provisions of the statute law, now in force and applicable thereto, and to such reasonable rules and regulations respecting such streets, highways and public ways and operation of cars as said common council may from time to time enact." It will be seen that the law made *in præsenti* a part of the grant was existing statutes of the state, not municipal ordinances, and that the language regarding regulations for the operation of cars was used prospectively. We are unable to find anything in the ordinance that requires or will permit a different construction to be put upon the language quoted than that which we have indicated. The reference to the old ordinance is in these words:

" This ordinance shall be void and of no effect unless said Chippewa Valley Electric Company is the owner by purchase, made under the authority of the circuit court of the United States of the Western district of Wisconsin or by other due and legal manner of the privileges, rights, and franchises existing by virtue of certain ordinances and of the ordinances heretofore adopted and passed by the common council of said city authorizing the construction of street railway and carriage ways in the city of Eau Claire."

There can be no reasonable doubt but a conflict of privileges, rights, and franchises was being guarded against, and that there was no other intent by the use of the quoted language. No necessity was left in the new grant for the exercise of any rights under the old one, for the former covered the whole field. It was new and original in every respect.

Though not necessary, it is deemed proper to discuss briefly

the first two propositions rendering the finding, as regards the failure of the motorman to ring the bell continuously, immaterial.    It is elementary that the power of the city council to enact ordinances is not unlimited.    It may go, within the field delegated to it by the state legislature, to the boundaries of reason.    Within such field its discretionary power is supreme, but it cannot legitimately go beyond.    If it does, in so far its enactments are void.    Whether, in any given case where the facts are undisputed, a city council has exceeded its power by the enactment of an unreasonable ordinance, is purely a judicial question, to be considered substantially the same as that of whether the legislature has exceeded its constitutional authority, reasonable doubts being resolved in favor of municipal power.    *Clason v. Milwaukee,* 30 Wis. 316; *Barling v. West,* 29 Wis. 307; *Hayes v. Appleton,* 24 Wis. 542; 17 Am. & Eng. Ency. of Law (1st ed.), 247, and cases cited; 1 Beach, Pub. Corp. §§ 512, 513, 514; Elliott, Railroads, § 1082. Many cases will be found within the field covered by the above citations which in principle condemn an ordinance requiring a bell on a street car to be continuously sounded while the car is in motion upon a street.    In *North Chicago City R. Co. v. Lake View,* 105 Ill. 207, an ordinance prohibiting the use of a steam motor on street cars was held void.    In *State v. Jersey City,* 27 N. J. Law, 497, an ordinance prohibiting a railroad train from obstructing a street more than two minutes at a time was so held.    In *Delaware, L. & W. R. Co. v. East Orange,* 41 N. J. Law, 127, an ordinance compelling the maintenance of flagmen at grade crossings was likewise held void.    In *Hayes v. Appleton,* this court, speaking by Dixon, C. J., said: "The power of a common council therefore extends only to the making of regulations for the good of the state.    They must be such as only prudence and reason require, not unreasonably prejudicial to private rights and interests."    Who can say that prudence and reason require that a bell shall be continuously sounded on a street car while it is in motion upon

the street?    No one, we venture to say, who applies ordinary
reason to matters of common knowledge.    Common sense
suggests that instead of operating to protect persons travel-
ing upon the street it would have the opposite effect.    It
would tend to alarm horses not familiar with it; and persons
would naturally become so familiarized with the sound that
it would cease to attract attention.    Without continuing the
discussion, we venture to say that no good reason can be
assigned for such a regulation in the operation of street rail-
roads.    The ground of the doctrine that the violation of an
ordinance designed to promote the safety of individuals is
negligence *per se*, is that it is a reasonable regulation to that
end.    *Smith v. Milwaukee B. & T. Exch.* 91 Wis. 360.    Hence
it goes almost without saying that whether the violation of
a regulation which is part of a granted franchise constitutes
actionable negligence, must turn on the same principle.    So
it follows that the guilt of the defendant found in answer
to the sixth question does not constitute actionable negli-
gence and is insufficient to support a recovery in favor of
plaintiff.

We have now, it seems, referred to every specific subject
of supposed actionable negligence covered by the verdict.
It was framed to answer the calls of the complaint, and the
questions discussed, evidently, were deemed to be all that
were necessary on the evidence, from the standpoint of the
trial court and that of counsel for respondent.    In that
view there was nothing for the jury to pass upon.    If there
can be any doubt about the case as the trial court viewed
it, from what has been said, it arises from the submission of
the seventh question, which was immaterial if the ordinance
requiring the continuous ringing of the bell was binding
upon defendant.    That question is as follows: "Was the
motorman of the defendant guilty of any want of ordinary
care in the manner and extent he rang the bell?"    It seems
that the requirement for the continuous ringing of a bell

not being binding on appellant, the question was immaterial, as it manifestly refers back to the one on that subject. The court charged with reference to it as follows:

"You should consider the ordinance making it the duty of the street-car company to ring a bell continuously. Of course you will have determined in answer to question No. 6 whether the bell was rung continuously or not, and if you find that the bell was not rung continuously while the car was in motion between Dewey and Farwell streets, then you will have to determine whether the fact proves that the motorman was guilty of any want of ordinary care in so omitting to ring the bell."

Obviously, if the requirements for the continuous ringing of the bell were valid — and it seems the learned circuit judge did not question that — it was not a matter for the jury to pass upon, whether the fact that there was a failure to perform that duty established want of ordinary care or not, because such failure of duty was negligence *per se*. If it was not a valid requirement,— and it was not, as we have seen,— there is nothing in the evidence suggesting the probability that ordinary care called for a continuous ringing of the bell. It was a clear, still night. There was no travel, to speak of, at the time. The time was such that much travel was not reasonably to be expected. It does not appear that there was any team upon the street other than the one in question. The conditions for seeing the street car for a great distance, by any person after reaching the line of Wisconsin street, were all favorable. The obstructions to the view, by a person approaching on the cross street, were not unusual. The track was somewhat on a down-grade but not unusually so,— not enough to materially interfere with the control of the car. The car itself was in perfect condition. If a jury could be permitted under such circumstances to say that ordinary care required the continuous ringing of a bell, they might do so in almost any case that is liable to arise. Nothing of the kind, we venture to say, has been

heretofore suggested in the law of negligence, as applicable to the operation of street cars.

There is another reason why the finding of the jury in answer to the seventh question is not sufficient to sustain the judgment, growing out of the erroneous instructions given in regard to it. The vice of the instruction as to the standard of care required of the motorman by the first question was carried forward into this and into all the intermediate questions. Such standard was many times stated as that of a prudent person under the circumstances, instead of a person of ordinary care. True, at one place in the instruction on the question under discussion the court said that the degree of care covered by it was that of an ordinarily careful and prudent person under the same or similar circumstances, but it had previously been said, in effect, that an ordinarily careful and prudent person, as regards the conduct of defendant, by its motorman on the occasion in question, was a person in the exercise of the "highest degree of skill and care,"— a person conducting himself up to the standard of "a careful and vigilant man" under the circumstances; that "of a prudent and vigilant person engaged in the management of the same business." At the particular point in question the subject was summed up thus: "You should consider these facts in determining whether the motorman was prudent and careful in ringing the bell." Manifestly that was all wrong. The jury should have been informed that they were required to determine from all the evidence bearing on the subject, whether the motorman exercised ordinary care,— such care as a person of ordinary care and prudence would ordinarily exercise under the same or similar circumstances. *Nass v. Schulz*, 105 Wis. 146; *Ward v. M. & St. P. R. Co.* 29 Wis. 144; *Wheeler v. Westport*, 30 Wis. 392; *Jung v. Stevens Point*, 74 Wis. 547; *Wall v. Highland*, 72 Wis. 435; *Hennesey v. C. & N. W. R. Co.* 99 Wis. 109.

Stafford vs. Chippewa Valley Electric R. Co.

There are a large number of exceptions to the instructions given to the jury aside from those heretofore mentioned, some of which we will briefly consider. The following language was used as to question 1:

" The driver of a private vehicle may cross the track . . . if he uses due diligence not to interfere with the passage of a car. Between street crossings the cars have the right of way superior to that of other vehicles, to be exercised in a reasonably prudent manner; but this rule does not apply to the crossing of a track at a street crossing. There neither has the right superior to the other."

That doctrine has been fully considered and rejected by this and by most courts. *Tesch v. Milwaukee E. R. & L. Co.* 108 Wis. 593; *Watermolen v. Fox River E. R. & P. Co., ante,* p. 153. It is difficult to conceive of a doctrine more promotive of mischief than the one embodied in the quoted language. If it were to prevail as a measure of the relative rights of a person operating a street car and a traveler upon the street, then each might run a race with the other and the one that arrived at the crossing first demand as a matter of right that his contestant give way for him to pass. Such a system would greatly interfere with the execution of the public purposes for which street-railway franchises are granted. It would, inevitably, greatly increase the number of accidents caused by cars in the street, which are now so numerous as to call strongly for methods of prevention rather than the adoption of judicial rules that will tend to greater confusion and danger, with consequent loss of life and property. Obviously, reasonable safety for travelers upon the streets as well as for patrons of street cars, and reasonable safety for persons performing the important duties of operating street cars as well, and reasonable execution of the purpose for which such cars are operated, require that, when a car is operated reasonably, that is, in such a way as to give reasonable notice of its approach to a street crossing and reasonable opportunity for travelers upon the street to keep

out of its pathway, the motorman exercising ordinary care
to control the movement of the car so as not to run into a
person who may inadvertently get in its way, it shall have
the right of way over a traveler with a vehicle or otherwise,
wishing to cross the track at that point; that such traveler
shall not have the same right to make the motorman stop the
car to allow him to pass as the motorman has to cause him
to stop to allow the car to pass; that such traveler shall not
have the right to go upon the track in the circumstances
stated in front of a moving car, when there is reasonable
ground to believe that so doing will require the speed of the
car to be slackened in order to avoid collision. That is the
reasonable, humane doctrine, it is believed. There must be
some regulation in such cases, whereby one right is primary
and the other subordinate. By universal custom, that is
recognized in the use of streets by ordinary travelers pass-
ing in different directions; and the statutory regulation re-
quiring travelers, when meeting upon the highway, to turn
to the right, is on the same theory. Sec. 1591, Stats. 1898.
The policy of the law is settled that way generally, where
there would otherwise be conflicting rights on public ways,
for the purpose of obtaining the best standard for peace and
safety, as for example, the relation of a railway company
with the public (Elliott, Railroads, § 1153; *Chicago, M. &*
*St. P. R. Co. v. Milwaukee*, 97 Wis. 418), and the relative
rights and responsibilities of towns where a highway from
one town to the adjoining town crosses a town line road
(*State v. Childs*, 109 Wis. 233). There are cases holding to
the contrary, but they are mostly if not exclusively cases
decided in inferior jurisdictions. They proceed to a con-
clusion upon the dangerous theory of a conflict of rights
between those operating street cars and travelers upon the
streets, in which the courts must take sides one way at one
time and another way on a different occasion, according to
the circumstances of the particular case. They proceed, also,

misconceiving the scope of street-car franchises and the power of municipalities over public streets. Streets are under the control of appropriate legislative agencies to be used in such reasonable ways as such agencies may determine in furtherance of the original design thereof. That includes power to grant street-car franchises with such limitations as regards the operation of cars or otherwise as may be deemed best for the public interests. When such a franchise is granted without limitations as to the operation of cars at crossings there passes with the grant all reasonable liberty of action necessary to effectually execute the purpose of the grant,— furnishing to the public facilities for quickly moving from place to place upon the street; and by implication other rights, so far as not unreasonably affected, are made subordinate. That requires travelers upon the street to give way for the passage of cars at street crossings, as before indicated, the same as at other points, though not to the same degree.

The following and similar language was used in the court's instructions: "The defendant company was bound to exercise its rights with the proper regard to the rights of others." "The motorman was bound to exercise a proper degree of care," etc. Such expressions were misleading and confusing. To say that a motorman was bound to exercise a proper degree of care is right in the abstract, but it fails to convey any information as to what is a proper degree of care. Without some explanation it would be no guide whatever but would leave the jury free to set up their own standard. Taken in consideration with the instructions to which the expressions manifestly referred — that the defendant and the motorman owed plaintiff the duty of exercising the highest degree of care, the care of a vigilant and prudent person in the same business under the same circumstances — they were clearly wrong, as we have before indicated.

This instruction was given:

"It is negligence on the part of a street-railway corporation to propel its cars at such a high rate of speed as to endanger the safety of persons attempting to drive onto or across the street."

The idea in that seems to be the same as in the instructions to the effect that a traveler on the street with a vehicle has the same right to compel the motorman to give way to allow him to cross as the motorman has to delay the traveler. The mere statement of the matter is sufficient to condemn it. It entirely ignored the true relations between the users of the space occupied by the street,— that one is the common right and the other the special right. The duty of the traveler to exercise ordinary care was ignored, and the mere fact of a car being operated so that a traveler cannot pass in front of it without danger was made negligence *per se*, regardless of whether the motorman was exercising ordinary care in his situation or not. It admitted readily of the meaning that a motorman must keep his car so under control that in case a person drives in front of it he can stop it before a collision can occur, and that if he does not he is guilty of actionable negligence.

The jury were instructed, in substance, not only that there was an ordinance in force in the city of Eau Claire limiting the right of defendant as to the speed of its cars to ten miles per hour and requiring the bell to be rung on each car continuously while in operation upon the street, but that if a violation of such ordinance was found by the jury it was still a question of fact to be determine by them whether such violation constituted a breach of duty as regards travelers upon the street. The subject covered by such instructions has been heretofore referred to in discussing the questions. It was error to hold that there was an ordinance governing the rights of defendant in the matters referred to. If there was such an ordinance and it was

valid, it was error to leave the question to the jury to say whether a violation thereof constituted negligence. The authorities are in substantial harmony that the violation of such a regulation is at least *prima facie* negligence, and this court, with many others, holds that it is negligence as a matter of law. *McCall v. Chamberlain*, 13 Wis. 637; *Smith v. Milwaukee B. & T. Exch.* 91 Wis. 360; *Toutloff v. Green Bay*, 91 Wis. 490; *Klatt v. N. C. Foster L. Co.* 97 Wis. 641; Elliott, Railroads, §§ 711, 1095.

We have referred to that element of the instructions as regards the effect of a violation of the ordinance, assuming that it was a valid regulation, because the exceptions seem to cover that field sufficiently to raise the question discussed. While that part of the charge was erroneous, it manifestly was not prejudicial to defendant. The only error which in any event could have been prejudicial to it was in the erroneous statement to the jury that there was in existence a valid ordinance on the subject referred to.

What has been said covers with sufficient particularity the entire field of errors discussed in the briefs of counsel, so far as the points are deemed material to this case, or should be treated in the case, whether necessary or not, as a help in future litigation. We will recapitulate the points decided for the purpose of definiteness and the benefit of greater facility for ready reference.

1. It is not actionable negligence for the motorman in charge of a street car, when the car is in operation upon a street and approaching a street crossing, to fail to exercise the highest degree of care, or such care as a vigilant or prudent person would exercise under the same or similar circumstances. It is sufficient if he exercises the care of a person of average prudence in the same or similar circumstances.

2. An instruction that a person in the circumstances above indicated must exercise due care or proper care, unexplained,

fails to instruct and may mislead. Coupled with instructions to the effect that the term refers to the highest degree of care or any degree of care other than that of a person of average prudence under like or similar circumstances, it is error.

3. The mere acquirement by purchase of a street-car franchise containing regulations as to the manner of operating cars, as a condition of a new and independent grant which does not refer to or in any way make the provisions of the old grant a part of the new one, such condition being clearly imposed to prevent a conflict of rights, does not add to or restrict the provisions of such new grant.

4. A city ordinance is not valid unless reasonable, and whether it satisfies that requirement or not is a judicial question.

5. A city ordinance requiring the continuous ringing of a bell upon a street car while such car is in motion upon a street is unreasonable and to that extent void for any purpose, unless made a condition of the grant.

6. If a requirement of the character above indicated is valid for any purpose because made a condition of the grant itself, the violation thereof does not constitute actionable negligence or evidence of such negligence, because, as regards the safety of travelers on the street, it is unreasonable.

7. As a rule the mere operation of a street car so as to render it dangerous for a person to cross the street in front of it is not negligence.

8. A traveler upon a street at a street crossing, desiring to cross the street-car track there situate, has not the same right to require the speed of a car to be slackened to enable him to pass over the track as the person in charge of the car has to require him to give way to allow the car to pass.

9. The motorman in charge of a street car approaching a street crossing must use ordinary care for the safety of

travelers liable to get into the pathway of the car, but he has the right to expect that such travelers will use ordinary care to inform themselves of the approach of the car and not to retard its passage.

10. It being the duty of the traveler upon the street, in approaching a point where he desires to cross a street-car track, to look and listen for a coming car and to perform that duty when and where he will have reasonable opportunity to render his efforts in that regard effective, it is as much his duty as a matter of law to see an approaching car which is in plain sight and in dangerous proximity to the crossing, and not to negligently place himself in the way of it, as it is to look for the car; and evidence that he performed the duty of looking but did not see the coming car does not raise a question of fact for a jury to determine.

11. It being undisputed that an alleged collision between a street car and a wagon that was suddenly drawn upon the track in front of a car at a street crossing did not result in any injury to the car other than a few scratches of the paint on the front end, nor disturbance of lights upon the car, the persons in charge thereof, or the passengers thereon, other than that caused by sudden application of the brake and reversal of the current; that the car stopped substantially at the place of the collision; and that it did not materially push the wagon ahead upon the track nor mar nor break it at the point of contact, such physical situation is so inconsistent with the theory that the car was going several miles per hour, for the few seconds required for a traveler, approaching a crossing at a speed of three miles per hour, to travel thirty feet, as to leave no ground for the jury to say that the mere speed of the car was so great as to constitute actionable negligence.

12. Testimony of a person or any number of persons that he or they, when approaching a street-car track with a view of crossing it, looked along the track for a coming car and

Stafford vs. Chippewa Valley Electric R. Co.

did not see one, though a car was in plain sight and so near the point of observation as to render an attempt to cross the track in front of it dangerous, is inconsistent with all reasonable probabilities and a jury should not be required or allowed to consider the subject as involving a disputable question of fact.

It is contended by appellant's counsel that the motion to change the answer of the jury on the subject of contributory negligence of plaintiff, covered by the ninth question, to the affirmative, and for judgment, should have been granted; and with that, it must follow from what has been said, we agree. It follows further, under the rule governing the subject, that appellant is entitled to have done that which ought to have been done by a judgment here remanding the cause upon reversal with directions to the trial court to correct the verdict as indicated and render judgment for defendant. *Menominee River S. & D. Co. v. M. & N. R. Co.* 91 Wis. 447, 457; *Conroy v. C., St. P., M. & O. R. Co.* 96 Wis. 243; *Keller v. Schmidt,* 104 Wis. 596.

*By the Court.*— The judgment appealed from is reversed. The cause is remanded to the circuit court with directions to correct the verdict by changing the answer to the ninth question from "No" to "Yes" so as, in form, to find the plaintiff guilty of contributory negligence in accordance with the facts, and to render judgment on the verdict as so corrected in favor of defendant for costs.