HUBBARD, Respondent, vs. McLEAN, Appellant.

*April 20—May 10, 1904.*

*Fraud: Evidence: Court and jury.*

1. Evidence of the fraud on which an action is based must be clear
   and satisfactory in order to justify a verdict for the plaintiff.
2. Where there is evidence in support of plaintiff's claim, its mere
   improbability will not warrant the court in taking the question

from the jury: but it may be so taken if the facts unquestionably proven contradict the claim and are so strong and convincing that all the reasonable probabilities of the case are against it.

3. In an action based on an alleged fraudulent representation by an attorney at law that plaintiff might sign certain promissory notes without incurring any personal liability, plaintiff's testimony as to such representation is *held* so overborne by his self-contradictions and by all the facts proven in the case as to require the court to say that there was no evidence to go to the jury.

APPEAL from a judgment of the circuit court for Dunn county: E. W. HELMS, Circuit Judge. *Reversed.*

For the appellant there were briefs by *Frank H. De Groat,* attorney, and *John M. Olin, John R. Mathews,* and *N. H. Clapp,* of counsel, and oral argument by *Mr. Olin* and *Mr. Clapp.*

For the respondent there was a brief by *E. B. & R. E. Bundy,* attorneys, and *Bundy & Wilcox,* of counsel, and oral argument by *C. T. Bundy.*

WINSLOW, J. This is an action to recover damages resulting from false and fraudulent representations. The complaint is long and involved. It will be found fully set forth in the statement of this case when it was here upon appeal from an order overruling a demurrer to the complaint, and need not be repeated now. 115 Wis. 9, 90 N. W. 1077. All the charges of fraud were denied by the answer. A trial has been had before a jury, and a verdict rendered for the plaintiff, and the defendant appeals.

The plaintiff's testimony tended to show the following facts: that prior to January 10, 1880, his father, Hamilton W. Hubbard, owned large tracts of land in Dunn county, including farming land and certain blocks in the village of Tyrone incumbered with mortgages owned by one A. L. Smith, a nonresident, who also held tax deeds on a part of said land; the defendant (an attorney at law) being his agent,

residing at Menomonie; that defendant was also the legal ad-
viser of said Hamilton Hubbard, and on said last-named
date, pursuant to defendant's advice, all of Hamilton's land
was deeded to one Hatch by Hamilton, and a release to Hatch
was executed by Smith, and Hatch thereupon gave two mort-
gages to Smith on said lands, including also certain of
Hatch's own land in Richland county, to cover the amount
of the Smith claims, which was then $2;200—all this being
done under the advice of the defendant, in order to preserve
the property for Hamilton against judgment creditors, Hatch
having no real interest but merely acting to preserve the prop-
erty for Hamilton Hubbard; that the Hatch notes were not
paid, and the mortgages were foreclosed by action in the
summer of 1881, and the lands went to sale September 30,
1882, and were bid off in plaintiff's name without his knowl-
edge, and deeded to him; that defendant and Hamilton Hub-
bard on the same day persuaded plaintiff to accept the deed
in order to save the farm for his father, and to execute notes
to Smith for $2,500, secured by a mortgage on the land, the
defendant falsely assuring the plaintiff that he would incur
no personal liability at all by signing the notes and mortgage,
and the plaintiff relying upon such assurance; that in Sep-
tember, 1883, Smith wanted his money, and that defendant
persuaded the plaintiff to give new mortgages and notes to
take up the Smith mortgage, upon substantially the same
representations as to his personal liability as before, two of
said notes of $1,000 each running to one Parker, and one of
$500 to Mr. W. C. McLean; that the Parker mortgage was
foreclosed by advertisement in September, 1888; that in
September, 1894, plaintiff was sued upon one of the Parker
notes (which had not been discharged by the proceeds of the
foreclosure sale) in an action brought by the Wisconsin Loan
& Trust Company (a corporation in which defendant was a
stockholder and officer); that the summons and complaint in
this action were personally served on the plaintiff, but when

he saw the papers were about the Parker business he paid no more attention to the matter, supposing that no personal claim was made; that in October, 1894, judgment was taken by default in that action, but no execution issued thereon until July 26, 1900, when execution was issued thereon, and the plaintiff's property seized, and he was compelled to and did pay the sum of $1,000 to save his property from sale. This sum, with interest, he has recovered by the verdict and judgment in this action.

On the part of the defendant all the allegations of fraudulent representations were explicitly denied, as well as the claim that he was ever the attorney of Hamilton Hubbard; and much correspondence was introduced tending to substantiate the claim that the plaintiff was always considered and treated as personally liable upon the notes to Smith and Parker, some of which letters will be referred to later in this opinion.

It will be seen from the foregoing statement that the fraud which was relied upon consisted of an alleged false representation as to the law, namely, the false statement that the plaintiff might execute a promissory note for value and not become personally bound by reason thereof. That there may be liability resulting from a false statement of the law when made under circumstances of trust and confidence, or when made to one who is known to be ignorant of the law for the purpose of misleading him, is settled by the decision upon the former appeal. That decision, however, was based upon the facts stated in the complaint, which are markedly different from the facts appearing upon the trial. The defendant moved that a verdict be directed in his favor, and made a motion for a new trial, after the verdict, on the ground that the verdict was contrary to the evidence, and, as both of these motions present the question of the sufficiency of the evidence and go to the merits of the whole case, they will be first considered.

The action being based on fraud, the evidence of the fraud alleged must be clear and satisfactory in order to justify a verdict for the plaintiff. *F. Dohmen Co. v. Niagara F. Ins. Co.* 96 Wis. 38, 71 N. W. 69. The question, therefore, is whether that rule was satisfied in the present case. It is proper to remark at the outset that the story of the plaintiff as to the supposed fraudulent statement is intrinsically very improbable. To suppose that a lawyer of respectable standing and active practice in a community would deliberately advise a business man that he would incur no personal liability by making and signing a negotiable note, especially when the lawyer himself had nothing to gain by it, is essentially improbable; to suppose that the lawyer imagined that so absurd a false statement could successfully deceive such a man is still more improbable; while to suppose that a man of sound mind and of a fair degree of experience in the world could be successfully deceived thereby is most improbable. But it is well recognized that there must be something more than mere improbability in order to warrant the court in taking the question from the jury where there is any evidence in support of the claim. It must be shown that there are facts unquestionably proven by the evidence which contradict the claim, and that these facts are so strong and convincing that all the reasonable probabilities of the case are on that side of the controversy, notwithstanding the evidence of an interested party to the contrary. *Flaherty v. Harrison,* 98 Wis. 559, 74 N. W. 360; *Stafford v. C. V. E. R. Co.* 110 Wis. 331, 85 N. W. 1036, and cases cited.

With these principles in mind, let us examine the evidence. At the time of the alleged false representation it appears by the plaintiff's own testimony that he was a farmer about thirty-five years of age. He had lived with his father until the spring of 1881, and had then married and gone to live upon and operate a farm of his own about three miles from his father's farm. He had been chairman of the town

board of supervisors for five or six years, and sat upon the county board, and was still chairman, in September, 1882. He had a fair English education, was town treasurer for several years after this transaction, and has held the office of clerk of his school district for several years. His general intelligence is not impeached, and he must unquestionably be regarded as a man of affairs, and not a mere child or a gullible half-wit. The improbability that such a person could be successfully deceived by the statement that he would incur no liability by signing a negotiable promissory note has already been referred to; but conceding for the moment that it might be done, the character and amount of proof submitted by the plaintiff to show that the misrepresentation was in fact made must be first considered.

In the first place, it is to be noted that the proposition is based upon the testimony of the plaintiff alone. Although he testifies that the misrepresentation was made in the presence of his father, Hamilton Hubbard, and although his father is still living, and his deposition was taken and used upon the trial, he was asked no question upon this subject, and nowhere testifies that any such statement was ever made by any one. This fact is very significant, especially considering the fact that the relations of father and son seem to be entirely friendly, and no reason appears why the father should not testify to every fact within his knowledge which would be favorable to the son, especially in a controversy arising out of an attempt by the son to assist his father financially. The situation, then, is this upon this branch of the evidence: The plaintiff testifies that but three persons were present at the time of the transaction—himself, his father, and the defendant. He testifies to a representation made more than twenty years before, which is improbable upon its face, and in direct contradiction of the written documents executed. He is flatly contradicted by the defendant, and his father is absolutely silent on the question. But, in

addition to the paucity and improbability of this evidence, based simply upon unassisted memory after a long lapse of time, the plaintiff upon cross-examination materially contradicts himself, and is forced to admit a number of mistakes in his first statement. He first testifies that his father and the defendant came to his house about the 22d of September, 1882, and wanted him to accept a deed of the farm and give a mortgage thereon to Smith, and that no one else was present. Afterwards he states that the first time a note and mortgage to Smith was mentioned was at the final conversation at defendant's office on the 30th of September. Still later in his examination he is compelled to admit that one D. R. Bailey, a lawyer then living in Hammond, was present at the conversation on the 22d of September, and that he was mistaken in his first statement. Again, he denies that D. R. Bailey was present when the deal was closed upon the 30th of September at *McLean's* office, but the original mortgage was produced, with Mr. Bailey's signature as a witness thereto; and then, while still stating that Bailey was not there, he admits that he has forgotten many things; that he knows the sum and substance of the affair, and that is all he knows about it. Again, he states that on the 30th of September, 1882, he was not, to his knowledge, owing Mr. Smith any money, but on cross-examination he was confronted with a note executed by Hatch to Smith of $1,000 dated January 9, 1880 (being one of the notes given by Hatch under the first arrangement), and shown his signature as a guarantor on the back, and a letter written by himself in February, 1881, in reference to the note, and was obliged to admit his liability, but claimed he understood that debt had been wiped out by the foreclosure proceedings. Later, however, he denied that he was told on the 22d of September anything about the foreclosure, and that he did not know what it was that his father wanted more time on.

We come, however, to written evidence in the record which

is not explainable on any reasonable theory consistent with the plaintiff's present claim, and which, we think, must be considered as conclusive against it. A letter was produced, admittedly written by the plaintiff himself to the defendant on the 26th day of August, 1883, with reference to one of the Smith notes covered by the mortgage, which reads as follows:

"I desire to ask a favor, and pay the interest on the note that is due this fall, and let the principal run a while, as the crops are backward. If you can grant the request, please inform me by return mail."

This was certainly a very explicit recognition of liability on the Smith notes, and was written within a year after their execution, and not in reply to any dunning letter. The only explanation given of it by the plaintiff is that he thinks he wrote it by his father's request, but that he cannot recall anything about it.

It will be remembered that on the 21st of September, 1883, two mortgages were executed by the plaintiff to take up the Smith mortgage—one of $2,000 to Parker, and one of $500 to W. C. McLean—both to cover plaintiff's notes. It is certain that this transaction was in response to plaintiff's request for further time in his letter of August 26th. The plaintiff testifies that both of these mortgages were executed in *McLean's* office under the same fraudulent representations as were made at the time of the giving of the Smith mortgage. On cross-examination, however, when shown the original mortgages with the signature of a neighboring farmer's wife as a witness, he is forced to admit that he must have been mistaken in stating that he signed them in *McLean's* office. These notes had interest coupons annexed; and another significant fact unexplainable on plaintiff's theory now appears. An interest coupon due March 21, 1886, was not paid, and after much dunning by letter an action was brought thereon in justice's court in May, 1886, in which the summons was personally served on the plaintiff,

and judgment by default taken, which was satisfied in August, 1886. In addition to this, however, it appears by original letters introduced in the case that in the years 1884, 1886, and 1887 the Hubbards were behind in their payments, and in all of those years there were numerous letters written by *McLean* to the plaintiff, dunning him and threatening proceedings at law, in all of which the claim of personal liability is unmistakable. It is true the claim is made by plaintiff that these letters went to his father and were answered by him, but all were addressed to the plaintiff and a number were certainly directed to the plaintiff's post office, at Hunt, instead of the father's post office, at Tyrone; and the conclusion is irresistible that some, if not all, of them reached the plaintiff from the fact that the plaintiff on October 3, 1887, himself wrote a letter to Mr. W. C. McLean, the defendant's partner, stating that:

"Father brought some letters down to me from you in regard to principal and interest on the Parker matter. I was somewhat surprised. I supposed that he had paid that $500 up before this."

The letter then proceeds to state that, if there could be a delay of fifteen or twenty days, till his father sold some potatoes, his father would fix it up. There is no intimation here of any claim that plaintiff was not personally liable; in fact, no such claim on the part of either father or son appears in the whole correspondence, notwithstanding the fact that the defendant's letters fairly bristle with claims of liability on the part of the plaintiff and threats of collection by legal proceedings. This absence of any claim to a defense when the claim of liability was repeatedly and persistently brought home, and in the years when the transaction was still recent, cannot, under any reasonable hypothesis, be reconciled with the idea that the plaintiff supposed that he had in fact any defense. Intelligent men do not do business that way. If *McLean* had procured the plaintiff's signature by

the fraudulent representation claimed, he *would not* at once have proclaimed the fact of his fraud by persistently insisting on the plaintiff's liability; and, on the other hand, if the plaintiff really supposed that he was not liable, he *would* at once have proclaimed the fact when the claim was made. Any other conclusion contradicts all human experience. The conduct of the plaintiff in allowing judgment by default to go against him in 1894, when sued upon one of the $1,000 notes to Parker, speaks loudly in the same direction. Here was a summons and complaint plainly stating a personal claim for $1,000 upon one of the notes. The action was brought long after the note was due, and there was no allegation of *bona fide* ownership. The summons and complaint were personally served on the plaintiff, and he paid no attention to them.

We have briefly reviewed the main facts in evidence. There are others of lesser moment, quite persuasive, which lead to the same conclusion, but which we do not deem it necessary to recount at length. A careful examination of the evidence convinces us that substantially every fact proven in the case, whether written or oral, contradicts the plaintiff's improbable and self-impeached claim, and that these facts are so strong and convincing as to carry with them all the reasonable probabilities, and require the court to say that there was no evidence to go to the jury.

*By the Court*—Judgment reversed, and action remanded for a new trial.